*TYPED & REFINED VERSION OF THE HAND-WRITTEN COMPLAINT*
*P.S. (CONTAINS 100% OF THE ORIGINAL FACTS IN THE HAND-WRITTEN VERSION)*

12-10-2009

U. S. DISTRICT COURT
Eastern District of Louisiana

FILED   FEB - 1 2010

LORETTA G. WHYTE
Clerk

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

Amar Paul Singh Sawhney

vs

09-07651 L(i)

TD- Ameritrade, et al

### COMPLAINT FOR MOTION TO VACATE AWARD (FINRA COPY ENCLOSED)
{The Honorable Judge: Please also review the enclosed documents}

Now comes Amar Paul Singh Sawhney, who lives in Metairie, State of Louisiana.

I am suing TD-Ameritrade, et al, **for their following serious operational problems, wrongdoings, and negligence**(s) in my stock and options tradings **primarily on June 26, 2008**, and, subsequently, on October 10, 2008, **wh ich have totally ruined and destroyed my entire life's savings and investment account of more than ten years**, during which TD-Ameritrade (TD-A) had *collected hundreds of thousands dollars in transparent commissions and interest charges alone* and the account (mainly because of my aggressive 'Leap Options' investment strategy that, on June 26, 2008, was irresponsibly and wrongfully denied by TD-A) had a cash balance of more than a million dollars on June 10, 2008:

1.      TD-Ameritrade FAILED TO RESOLVE THEIR WELL-DOCUMENTED & ADMITTED OPERATIONAL PROBLEMS OF THEIR ONLINE TRADING SYSTEM FOR CERTAIN COMPLEX OPTIONS, **DESPITE** the claimant's as well as the TD-Ameritrade's own managers' and representatives' numerous complaints and concerns for a longtime; however, during this long time period, TD-A representatives always acknowledged the company's serious online trading (operational) problems **and always claimed that the company was committed to resolving them soon.** In other words, whenever I complained about the company's serious and problematic online system for trading certain Complex (Spread) Options in particular, the TD-A representatives and even my account managers **always acknowledged the problems and always said** that "they" (i.e., the TD-A company) were fully aware of the problems of the online trading system **and that they (TD-A) were working to "OVERHAUL" the system to resolve the problems. However, the company really never resolved the seriously lingering problems that initially, in my June 26, 2008, online trading, contributed to a relatively very high (however, still manageable by the claimant) margin debt of ~$400K, when the margin debt the day before, i.e., on June 25, 2008, was only ~$45K (please review Exhibits 3, 2 and 1 of the claimant's Statement of Claim

Fee_____
Process_____
X  Dktd_____
X  CtRmDep_____
Doc. No._____

<u>filed with FINRA).</u>

2. <u>TD-Ameritrade WRONGFULLY OVER-EXTENDED MARGIN (DEBT) AND BUYING POWER IN REAL TIME.</u>
<u>DESPITE</u> THE DANGEROUSLY HIGH MARGIN ADVANCE (DEBT) OF ~ $400K MENTIONED IN ITEM 1 ABOVE, TD-Ameritrade <u>STILL EXTENDED, IN REAL TIME, ADDITIONAL ~ $250K OF MARGIN (DEBT) to the claimant for purchasing stock and options (please do review Exhibit #2 filed with the FINRA Arbitration), especially when the critical liquidation-to-debt ratio already was at a dangerously low level of only ~ 12.5%, according to TD-Ameritrade's own Risk Department-mandated guidelines and real-time records.</u>

<u>And, FURTHERMORE, TD-Ameritrade EVEN ALLOWED (i.e., TD-A approved and permitted) the claimant to actually trade and legitimately purchase 20K GM shares (for ~$230K in four (4), not one (1), different orders/trades) with the ~ $250K margin advance that, in real time, was made available to the claimant for purchase of stocks and options.</u> This TD-A-approved and executed purchase of 20K GM shares, <u>with the TD-A-extended margin funds of ~ $250K made available in real time for purchase of securities and options</u>, obviously and predictably incresed the margin debt to ~ $630K. In order to reduce the high margin debt (extended by TD-A, in the first place) and thus improve the critical liquidation-to-debt ratio, the claimant placed several, perfectly legitimate orders to sell <u>COVERED</u> leap calls (WGMAB) on his <u>long 20K GM shares that TD-A, in themselves, had authorized the purchase with the real-time funds made available.</u> Incidentally, the sale of 200 WGMAB covered calls (at $4.20 a share) would have generated ~ $90K in new money, while effectively reducing the claimant's purchase price of a GM share to only ~ $7.30 (instead of actual market price of ~ $11.50). However, TD-A rejected all those perfectly legitimate covered call options orders, while still permitting the claimant to continue to purchase more 5000 GM shares with the real-time margin funds still made available (Please review Exhibit #2). <u>Also, please note that the covered calls bring (new) money into the account; reduce the margin debit and, hence, and, improve/increase the critical liquidation-to-debt ratio %age; and, also importantly, carry no margin maintenance requirements.</u>

3. <u>TD-Ameritrade WRONGFULLY DENIED THE CLAIMANT'S NUMEROUS LEGITIMATE SELL ORDERS OF 700 GM COVERED CALLS FOR ~$300K TO DESPERATELY REDUCE THE "TD-A-INDUCED" ALARMINGLY HIGH MARGIN DEBT.</u>

<u>DESPITE</u> the ballooning margin debit and, hence, the dangerously low liquidation-to-debt ratio (which, as previously described, were <u>primarily caused</u>, in the first place, by the company's operational problems and other serious actions/mistakes of over-extending the margin debt and even permitting the

purchase of new 20K GM shares), **AND DESPITE** the claimant's numerous desperate attempts to reduce the huge debt and, hence, improve the alarming liquidation-to-debt ratio by selling up to 700 legitimate covered call options (wgmab), for ~ $300k, on the 70k (20k new +50k old) gm <u>long shares</u> in real time in the account, <u>td-ameritrade continued to wrongfully reject and deny all the perfectly legitimate sell orders</u> and thus bar/prevent the claimant to bring in the badly needed new money of ~ $300k. Again, <u>it is critical to please note that the covered call options do not require any additional margin maintenance (MMR) and, therefore, the legitimate sales of the covered call options</u> would have: 1) brought ~ $300,000 into the account, 2) considerably reduced the TD-A-induced ballooning margin debt, 3) appreciably increased/improved the critical liquidation-to-debt ratio, and, consequently, 4) avoided the following destructive forced sellout of the claimant's 40,000 GM long shares, 20,000 of which had been legitimately purchased just a few minutes earlier with the due approval of TD-A and with the real-time margin funds also made available by TD-Ameritrade.

[It may again be emphasized that the highly ballooning margin balance essentially was created by TD-A in the first place by advancing ~ $250K in real time when the margin debt in real time already was very high at <u>~$400K that, in turn, was also caused/generated mainly due to TD-A's</u> **self-admitted**, long-lingering, unresolved problems of their online Complex/Spread Options trading system <u>that did not allow the claimant to place an industry-normal, 2-leg Spread Options order which would have generated a much smaller and esaily manageable margin debit</u>. However, the claimant had to place two separate, single-leg options orders, instead of only one normal 2-leg Spread, in order to cover the previous day's margin call of ~ $50K. Incidentally, earlier in the morning before the market opened on June 26, 2008, three (3) TD-A reps whom the claimant had contacted (**TD-A claims 24/7 service**) to cover the previous day's margin call did not even know how to place a Spread Options order (TD-A-recorded document)].

4) TD-A'S FORCED SELLOUT (<u>w/o the claimant's knowledge whatsoever</u>) on June 26, 2008, OF THE CLAIMANT'S 40,000 GM SHARES (<u>20,000 of which were legitimately purchased just a few minutes ago with the due approval and authorization of TD-A and with the real-time margin advance of ~ $250K</u> made available by TD-A) and a FORCED CLOSEOUT (again <u>w/o the claimant's knowledge whatsoever</u>) on October 10, 2008, of the astonishingly-elevated "ELITE" account now (<u>i.e., after the account's almost destruction on June 26, 2008</u>). AND, MORE IMPORTANTLY, TD-A'S MANAGERS/OFFICERS/REPS, USING "DELAY TACTICS" ON BOTH THE OCCASIONS, ARROGANTLY DENIED THE CLAIMANT'S SINCERE, TIMELY AND REPEATED REQUESTS (IN FACT, BEGGINGS) TO PUT THE DISPUTED TRADES BACK ON TRACK <u>BY REPLENISHING (i.e., NOT REVERSING) THE DISPUTED TRADES AT THE CLAIMANT'S OWN COSTS/LOSSES, due to any unfavorable price fluctuations of the disputed trades involved.</u>

According to TD-A, the dangerously low liquidation-to-debt ratio of ~ 9 % of the

**account on June 26, 2008, had triggered an immediate forced sellout of 40,000 GM shares** (*20,000 of which were legitimately purchased just a few minutes ago with the due approval and authorization of TD-A and with the real-time margin advance of ~ $250K made available by TD-A*). **This TD-A-caused sellout cosequently destroyed sustainability of the claimant's only longtime account with TD-A. As clearly explained in the items described above and again summarized below for refreshing, TD-A's own operational problems and wrongful actions (mistakes) essentially caused the dangerously low liquidation-to-debt ratio in the first place:**

i) TD-A's own well-documented **problematic online Spread-Options trading system** that did not allow the claimant to place an industry-normal, 2-leg Spread Options order to altogather avoid the initial (however, still manageable) high margin balance of $400K. The claimant instead had to place two separate, single-leg option orders to cover the previous day's margin call, which abnormally increased the margin. However, as mentioned below, TD-A still advanced more ~ $250K margin for purchase of stocks and options.

ii) TD-A's faults of over-extending an already huge margin (debt) of ~ $400K *(with the Liq-to-Debt ratio of ~12.5% already at a dangerously low level, according to TD-A's own risk department)* by yet additional ~ $250K in real time for purchasing stocks and options and, furthermore,

iii) Even approving and executing the purchase of additional 20K GM shares (in four separate trades) that <u>legally became long</u> in the account.

iv) **Most importantly**, <u>TD-A wrongfully denied the claimant's perfectly legitimate sales of all MMR-less Covered Call Options on the claimant's legitimate GM long shares in the account, which would have brought up to $300K in new money.</u> However, as revealed in TD-A's own trading log (Exhibit #2), TD-A still continued to approve purchase of additional GM shares **even after** denying the legitimate sales of Covered Call Options on the shares that TD-A themselves, just a few minutes earlier, had approved and authorized the purchase with the real-time margin funds made available to the claimant for purchase of stocks and options. The covered calls at the time were bringing $4.20 a contract (per share of GM), thus effectively reducing price of a GM share to only ~ $7.30, when the current price of a GM share was $11.50 and thus the $10 calls were in the money.

**Obviously, the unwarranted forced sellout on June 26, 2008, without the claimant's knowledge what-so-ever** (*especially considering the other totally genuine and pertinent circumstances that are described in details in the claimant's Statement of Claim with FINRA*), **suddenly and abruptly left the claimant's entire life's, longtime, investment account with less than half the stock portfolio and still with a very high margin debt/balance of ~$230,000, which almost destroyed sustainability of the account and ultimately totally destroyed the account on October 10, 2008, with a deficit balance of $1143. Although the account just a couple of months or so ago had equity of more than 1.25 million dollars with a**

little or no margin loan/debt and although, because of the declining market as a whole and GM in particular, the account <u>liquidation value</u> on June 25, 2008 (i.e., the day before the TD-Ameritrade-induced/caused forced sellout of 40,000 GM shares) was only ~ $150K, <u>the account had more than a million dollars in cash on June 10-12, 2008 (i.e., just two weeks ago). And this kind of healthy cash balance almost throughout the year was mainly generated due to and maintained by the claimant's consistent GM Leap Options investment strategy (please see the admitted testimony of the claimant's colored chart of my GM options strategy over a full year)</u>, which TD-A, on June 26, 2008, by way of wrongfully barring and denying the legitimate sales of 700 GM covered call options for ~ $300K, prevented and thus crippled the claimant to pursue and sustain his longtime, aggressive account for an healthy growth in the market upturn. As shown under item #3 above, a perfectly legitimate sale of up to 700 GM <u>COVERED CALLS</u> (on the 70,000 GM long shares in real time in the account) for ~ $300,000 in cash proceeds would have substantially reduced the huge margin debt *(induced or caused by TD-A, in the first place)* and saved the account for a potential significant growth in the historic market upturn of ~ 60% that began in March '09, following the historic downturn of late '08.

It is also very important to know that later, when the GM became bankrupt, <u>the above referenced WGMAB short calls</u> would have been immediately worth ~$300,000 and the claimant's "targetted WGMAA naked short calls of $5 strike price," or other lower denomination of interest, would have been worth a lot more, i.e., up to ~ $750,000. However, because of the ultimate total destruction of the account by TD-Ameritrade (the company), the claimant now has been irreversibly destroyed financially and emotionally. <u>In fact, since October 10, 2008, and until today, December 10, 2009, the claimant could not, and indeed did not, invest and/or recover even a single dollar during the recent historic market upturn that started in March '09.</u>

<u>YOUR HONOR,</u> THE CLAIMANT HAD INVESTED HIS ENTIRE LIFE'S SAVINGS AND INVESTMENTS OF ~ A MILLION DOLLARS WITH TD-AMERITRADE DURING THE PAST 10 YEARS. <u>IN THIS TIME PERIOD, TD-Ameritrade CHARGED THE CLAIMANT'S ACCOUNT WITH HUNDREDS OF THOUSANDS DOLLARS IN THEIR TRANSPARENT COMMISSIONS AND INTEREST CHARGES ALONE.</u> However, despite the claimant's long-term relationship with TD-A <u>and despite the above documented 100% facts that on June 26, 2008, TD-A essentially had destroyed sustainability of the account,</u> the company mercilessly, without any notification what-so-ever, totally destroyed the account on October 10, 2008, with a forced closeout and a deficit <u>of just $1143</u>, especially when the account on that day still had a cash balance of ~

$25K; no margin call; no call from the claimant's now Elite Manager for the claimant's (NOW) Elite Account (surprisingly, "*upgraded and elevated immediately after the almost destruction of the account on June 26, 2008*"); 3500 EMC long shares fully paid; 35 EMC Leap Covered Calls with no margin maintenance requirement; 800 GM long shares fully paid; and 60 GM short Puts of $10 strike price. It seems that for their own and their partners' considerable financial benefits, TD-A, this time, did not even care to call the claimant (*even though in the June 26, 2008, sellout, TD-A claimed that they had tried to contact the claimant, when they (TD-A) were fully aware of the facts and genuine circumstances that any telephone communications on that day were impossible*) to let him (now an "Elite client") take care of the account. And which could have been easily done either by selling (*which, incidentally, again due to the previously stated TD-A's lingering problem of unreliable online trading of spread options, the client could not place a legitimate spread order online the day before*) GM calls against the GM Puts through a live TD-A broker only, or/and by just depositing only a couple of thousand dollars, via wire or ACH, in the account (which had been done numerous times before). TD-A and their partners apparently made a lot of money in this unwarranted, total closeout of the account, especially by first buying back to close 60 (= 6000 GM shares) GM Leap (2010) puts of $10 strike price at ~$8.35, when the GM stock was selling in a narrow range of ~$4.39 to $4.89 (the previous day close, and when the referenced Puts of interest were at ~$7.50).

At any rate, the moment a TD-A female rep (not the claimant's Elite Account Manager) called (~ an hour after the total closeout of the account) the claimant and asked for a payment of $1143 due to a deficit (*w/o divulging anything about the closeout or how the deficit was created, despite the astonished claimant's repeated inquiries*), the claimant instantly called his Elite Account Manager to find out how the reported deficit was generated. Initially, he impolitely informed that a total sellout had occurred when the account liquidation value had gone negative. I was totally surprised on hearing what he so bluntly had said to his/TD-A's now Elite client, especially when he already knew well enough that TD-A almost had destroyed the account on June 26, 2008, and then (deceptively) elevated the account to the Elite level under him personally. Frankly, he had not even cared to give a simple call to remedy a relatively very minor situation that had popped up totally unexpected. In any case, making the story short, the claimant repeatedly requested, pleaded and even begged this TD-A account coordinator/manager to kindly ask the company supervisors to help me in replenishing (not reversing) the "soldout securities" (only 4 trades) at the claimant's own costs and losses (*if any, due to any unfavorable price fluctuations that might had occurred during the hour or so that elapsed between the sellout and the time of my requests/begging to him*) with the fresh money up to $10K (*even though the prices of the securities involved were pretty stable and the estimated difference due to overall spreads in the bid and ask prices of the disputed securities was much less than 10 thousand dollars*) to be instantly wired or sent via ACH (as it had been done on numerous times before). For the first few minutes of our conversation, the manager arrogantly and bluntly refused to cooperate in any way. However, after my almost constant begging for some help

from TD-A, he agreed to consult presumably with his superiors in TD-A and also to calculate the money that I must immediately wire or send via ACH from my computer, <u>in order to expressly replenish/execute the only 3 or 4 trades "before the market closed."</u> So, he asked me to hold the telephone line. <u>I had held the line for more than 20 minutes when he only returned after one minute the normal market (for options) had closed.</u> In any case, I could not even imagine that TD-A, *especially after their June 26, 2008, created episode when they (TD-A) mysteriously "elevated" the account to an Elite status*, could take such an action to completely destroy the long-term account without even a courtesy call. So, I kept on literally begging for some cooperation and help from TD-A in replenishing (RESTORING, <u>NOT REVERSING</u>) the few (3 or 4) positions (disputed trades) <u>entirely at my costs and losses</u> (if any due to any unfavorable price fluctuations). <u>Finally, he agreed to call me before the market opened the next business day</u> and let me know exactly how much money I should wire/ACH for the <u>"difference"</u> between the "sellout prices" and the new "replenishing/repurchasing prices" of the 3 or 4 positions requested and for any other margin call or account deficiency that might be necessary. <u>He never called me</u>, despite an <u>express reminder</u> for him that I also had left with his coworker early in the morning before the market opened the next business day. The coworker had religiously promised to ensure that the manager would receive the message as soon as he came in. Basically, by deploying "delay tactics," TD-A, as they previously had also done on June 26, 2008, again denied my timely and sincere requests to put the disputed trades back on track at my costs and losses. All of these stated facts are recorded and well documented in the case files.

SUMMARY:
Your Honor, in view of all the above 100% facts that were presented in volumes of <u>submissions</u> to TD-A, FINRA, and TD-A's Counsel, I am seeking justice by claiming at least $750K from TD-Ameritrade (<u>the company</u>), mainly to compensate for the financial damages that occurred on June 26, 2008, mainly due to TD-A's wrong actions of over-extending margin of ~$250K in the first *place (when the liquidation-to-debt ratio, according to TD-A's own rules and regulations, was at a dangerously low level of ~ 12.5%) and* even approving/authorizing the purchase of additional 20K GM shares with the real-time margin funds made available, but then not allowing the claimant to sell perfectly legitimate GM Covered Calls for ~ <u>$300K in his desperate attempts to reduce the huge margin debt that essentially was generated by TD-A's wrong actions</u> and operational problems in the first place. Your Honor, it may also be known that the claimant <u>always tried his best to reduce and minimize the margin/loan/debt from TD-A. For example,</u> he had a loan of only ~$45K on the morning before the market opened on June 26, 2008, when the account liquidation value was ~ $150K. However, TD-A's previously described serious operational problems and wrong actions ballooned the margin debt that essentially triggered the forced sellout of 40,000 GM shares, which left the account almost unsustainable with a margin debt of ~$235K (at much higher interest charges, compared to extremely low interest payments that TD-A pays on cash balances). This huge margin loan/debt relative to the account's then very low liquidation value was turned into a small credit balance of a few thousands dollars <u>within only 3 business days by</u>

applying the same, year-long investment strategy of GM leap options - the strategy that had enabled the claimant to preserve more than a million dollars in cash in the account in early June 2008 (i.e., just a few days before the June 26, 2008, destruction of the account by TD-A) and a good healthy credit balance almost throughout the year (Exhibit 3). But, on June 26, 2008, the TD-A company, by irresponsibly acting and denying my fully legitimate sell orders of 700 call options for ~ $300K, did not let me pursue the strategy. This TD-A's irresponsible action in particular resulted in triggering the sellout of 40000 GM shares, which rendered the account almost unsustainable and subsequently totally destroyed the account and ultimately crippled me financially and emotionally.

The case and discovery materials of >500 pages will be brought, if and when demanded, for your review to fully understand this genuine case. In the meantime, the claimant kindly requests your honor to please review the attached typed letters to FINRA, in order to confirm the basic underlying issues of the case. Without offending anyone in the FINRA Arbitration Panel of the case, I must reiterate here that the Panel had executed the Award, dated November 20, 2009, attached herewith, without properly understanding the case's subject matter, viz., the main, underlying issues of TD-A company's serious and well documented operational problems and the options-related issues of June 26, 2008, trading. This 72-year old claimant, who before had never been involved in any arbitration or law suit of any kind and who, therefore, had incorrectly assumed that the Panel would have the required knowledge and would have thoroughly reviewed the entire case submissions, now firmly believes that the Panel members (*incidentally, the two of three members of the panel were installed just a few days prior to the Hearing to replace the two, including the Chairman, who abruptly withdrew after being more than seven months on the case_??*), in fact, did not even read most of the case materials and submissions either before or even during the Hearings. It was clear that they (at least two of them) did not even understand the basic, underlying issues of the Covered Call Options and how to read/interpret the TD-A company's supplied Log of the incumbent's trading that occurred on June 26, 2008. They almost totally were focused on the two broker witnesses (*whose "hands," based on their own testimonies, were "tied up," i.e., they practically had no control on the company's computerized systems of handling trades/orders*). The Panel absolutely did not pay any attention to focus on the company's significant wrongdoings of over-extending margin, authorizing purchase of GM stock with the margin money made available, and, most importantly, not permitting legitimate sale of Covered Call Options for ~ $300K on the legitimate 70K GM long shares in the account in real-time. In a way, the claimant was even somewhat discouraged to properly and fully present verbally his evidence-specific and rebuttal-pertinent materials that, however, had been submitted in written texts, as the claimant's testimonies, to all the participants, including the defendents' counsel, before the hearings began. However, the claimant believes that the panel members probably did not have the time and opportunity to even fully review them all. Thus, in view of the Panel's certainly less-than-satisfactory performance mainly due to their lack of expertise in the required field, the claimant humbly requests your honor to kindly vacate the Award and order an

appropriate judgment against TD-Ameritrade.

Sincerely,

*[signature]*

A.P.S. Sawhney
4709 Sheridan Avenue
Metairie, LA 70002

<paulsawhney@hotmail.com>

Tel: (504) 286-4568   (W)
         455-8568   ( H )

From: paulsawhney@hotmail.com
To: jlucas@saretsky.com
CC: paulsawhney@hotmail.com
Subject: RE: Sawhney v. TD Ameritrade; Case No. 2:09-cv-07651-EEF-SS
Date: Sat, 30 Jan 2010 18:49:40 +0000

Janine Lucas, Esq.
Saretsky, Hart, Michaels & Gould, PC
995- South Eaton
Birmingham, MI 48009

**Subject: Civil Lawsuit**, dated December 10, 2009, against TD-Ameritrade, filed in the United States District Court for the Eastern District of Louisiana.

Dear Ms. Janine Lucas, Esq.

Thank you for your letter, dated January 25, 2010, received only yesterday, January 29, 2010, evening and came to know that you and Mr. Miles Hart, Esq., are going to represent TD-Ameritrade in the subject lawsuit. Accordingly, I have just now mailed, via. US Priority Mail, the <u>original</u> Summons (<u>with the court seal</u>) to your attention, <u>with a request</u> to now expedite the preparatory processes, including your Answer to the Complaint that, along with the request for "Waiver of Service" and other three (3) important documents, were sent to you (i.e., Mr. Miles Hart, Esq.) and to TD-Ameritrade on December 23, 2009.

Incidentally, I checked my e-mail just now, i.e., after returning from the post office and mailing the original Summons, and opened your e-mail below.

Best regards.
Paul Sawhney
4700 Sheridan Ave
Metairie, LA 70002

+++++++++

Subject: Sawhney v. TD Ameritrade; Case No. 2:09-cv-07651-EEF-SS
Date: Mon, 25 Jan 2010 17:07:51 -0500
From: JLucas@saretsky.com
To: paulsawhney@hotmail.com

Dear Mr. Sawhney:

Please see the attached letter and waiver of service form in the above matter.

Regards,

Janine M. Lucas
Saretsky Hart Michaels & Gould PC

995 South Eton Street
Birmingham, Michigan  48009
telephone: 248-502-3300
facsimile: 248-502-3301
jlucas@saretsky.com
www.saretsky.com

```
This   e-mail   message   and   all   attachments   transmitted   with   it   are
intended  solely  for  the  use  of  the  addressee  and  may  contain  legally
privileged  and  confidential  information.  If  the  reader  of  this  message
is  not  the  intended  recipient,  or  an  employee  or  agent  responsible  for
delivering   this   message   to   the   intended   recipient,   you   are   hereby
notified  that  any  dissemination,  distribution,  copying  or  other  use  of
this  message  or  its  attachments  is  strictly  prohibited.  If  you  have
received  this  message  in  error,  please  notify  the  sender  immediately  by
replying  to  this  message  and  please  delete  it  from  your  computer.
```

Hotmail: Trusted email with Microsoft's powerful SPAM protection. Sign up now.

Your E-mail and More On-the-Go. Get Windows Live Hotmail Free. Sign up now.

December 16, 2009

Rose M. Schindler
Vice President and Director
FINRA, Southeast Regional Office
Boca Center Tower 1
5200 Town Center Circle
Suite 200
Boca Raton, FL 33486-1017

**Subject: FDRA 08-04168   <Sawhney vs. TD-Ameritrade>**

Dear Ms. Schindler,

In response to your two letters, dated December 8 and 11, 2009, I am obligated to once again report the following serious discrepancies, improprieties, intentional distortions, and wrong actions/doings that occurred and, I strongly believe, considerably contributed to the clearly unfair and unjustified FINRA Arbitration Award, dated November 20, 2009, on the subject case (FDRA 08-04168):

A.  **FINRA-RELATED ITEMS:**
   1. The claimant's critical e-mail/letter, dated January 20, 2009, to FINRA, requesting an expeditious Arbitration Panel hearing on an extremely genuine medical ground was not transmitted (most likely intentionally) to the original Panel, despite FINRA's acknowledgment (via. e-mail-reply mode) confirming that the January 20, '09 letter (along with the Case materials, i.e., the Statement of Claim and its Exhibits) would be forwarded to the respondents and the Panel members, as requested in the claimant's e-mail/letter, dated January 20, 2008. However, despite the claimant's several subsequent alerts and reminders to FINRA to ensure delivery of the critical letter to the Panel, FINRA really never sent the letter to anyone until much after the March 23, 2009, Pre-hearing (*which, incidentally, also had made abundantly clear to the claimant that the Panel Chairman absolutely had no clue of the letter; furthermore, despite the claimant's fresh verbal notification of the urgent need/request for an early Panel Hearing, the Chairman scheduled the panel hearing (for a > 71-year old claimant) more than a year after the complaint/claim was filed*), only **when** the respondents' Counsel in April of 2009 expressed a great surprise to the letter's reference in the claimant's later communication in April '09. In other words, despite several alerts and requests made to FINRA, the claimant's critical request/letter of January 20, 2009, to expedite arbitration hearing had never been sent in a timely manner to any respondent or panel member until the claimant finally begged in April of 2009, i.e., after the pre-hearing in which the Chair first suggested a January 2010 date for the hearing and then scheduled November 17, 2009, which was more convenient to the respondents' Counsel, Ms. Janine Lucas, Esq..

   Frankly, the claimant has some doubt whether the two Panels (old and new) even had the opportunity and perhaps the time and desire to <u>thoroughly</u> review the case materials in a timely manner. Since the two public arbitrators (*paid by FINRA*), including the Chairman, an honorable retired judge, after being on the subject case for more than seven (7) months, suddenly and abruptly decided to withdraw from the arbitration just a week or so prior to the hearing at least shows to the claimant that they perhaps "looked at" the case materials only a short time before the hearing date and determined that TD-A (*a logical favorite to FINRA that is largely supported financially by TD-A and other WS financial industry giants*) had a weak case because of the several serious wrongdoings the company had committed and, therefore, it would be difficult for them (the panel) to defend TD-A, as conventionally intended.

   2. FINRA rule dictates that certain materials and witnesses, etc., must be presented at least 20 days prior to the hearing. However, the respondents' Counsel, Ms. Janine Lucas, Esq., in her letter, dated October 28, 2009, to FINRA challenged that rule by expressing her "right" to submit any additional material and/or witnesses until the hearing date. The claimant, a layman, brought this discrepancy to attention of the FINRA CA, who apparently ignored the issue and nothing was done to discourage that wrong kind of behavior by the respondents' counsel.

3. FINRA's instructional brochure on the Arbitration Procedure contains the following, emphasis-laden phrase: "The Arbitration Panel will **ENDURE** to reach a decision within **30 days**." My lord, the panel of my case rendered a totally unfair and unjustified Award in a short session soon after the (brief) hearing sessions. This sort of deceptive language or unrealistic propaganda by FINRA really does not bear any good impression to any honest person.

4. Mr. Frank Solomon, a TD-A broker and one of the respondents in the case, had not submitted his Uniform Submission Agreement. Despite the claimant's alert to the FINRA-CA and the respondents' Counsel regarding this technical inadequacy and despite the Counsel's subsequent commitment to immediately produce and file the required Uniform Submission Agreement by Mr. Solomon, it was never filed. The claimant had to bring this matter to attention of the Panel on the hearing date (November 17, 2009) and the required document was only submitted on November 19, 2009, i.e., after the hearings had ended!

5. FINRA rules require that any communications (conversations) between the contesting parties must be simultaneously (and with the same mode of transmission) transmitted to FINRA. In other words, as the claimant understands, no communications between the parties should occur without FINRA. A few days prior to the Arbitration Hearing, the respondents' counsel (pretending an introductory call) called (communicated with) the claimant, presumably to get some sensitive information about the case hearing. The claimant immediately informed the FINRA-CA about this violation of the rule. The FINRA apparently did not consider it an issue.

6. At the nomination/selection by FINRA of the new Chairman just a week or so prior to the hearing, the claimant expressed his legitimate concerns about 1) the short period of time and, hence, the inability that the new Chairman would have to comprehensively review and understand the huge volume of my case materials and 2) the lack of securities/options knowledge/expertise of both the two new Public panel members installed just a couple of weeks prior to the hearings. However, the FINRA-CA, in her telephone call to the claimant, told the claimant that the new Chairman was quite knowledgeable and that he had been a judge. His resume does neither show that he ever was a judge nor show he has had any expertise in the securities/complex options - the main underlying issues of the subject case/dispute.

7. During the entire period of almost a year of numerous communications between the FINRA_CA (Ms. JoAnne Sorrentino) and the respondents' Counsel, Ms. Janine Lucas, Esq., the latter always addressed the CA with the latter's family name (i.e., Ms. Sorrentino). However, immediately after the FDRA Award was declared in favor of the respondents, the latter's Counsel started addressing the FINRA-CA with her first name (Joanne). This should indicate "something" to a normal person of average intelligence.

8. From the respondents' Counsel's communication, dated October 26, 2009, to Ms. Sorrentino, it was pretty clear that the Counsel purposely did not want FINRA to forward the claimant's Case Summary, dated October 16, 2009 (which actually was e-mailed/motioned to all the parties on October 25, 2009), to the new Panel that, just about a week before the 8-month old scheduled hearing date, had a new Public Arbitration Chairman to replace the original Chairman (a former judge, who had knowledge of securities and especially Options). However, the Counsel somehow (the reason unknown to the claimant) decided to submit a response (Answer) to the claimant's case summary, dated October 25, 2009, and e-mailed (also postal-mailed) the "response/answer," however, titled Case Summary, dated October 28, 2009, to FINRA and to the claimant. **Surprisingly, on November 12, 2009,** i.e., more than 2 weeks after receiving the Counsel's so-called Case Summary, dated October 28, 2009, the FINRA-CA responded to the Counsel's (original) October 26, 2009, communication/e-mail (referred above) and stated that the claimant's briefs/motion/case summary, dated October 25, 2009, had been forwarded to the (new) panel and that if the Counsel wished to give a **response** to the claimant's briefs/Case Summary, the same would be also be forwarded to the panel (for the hearing on November 17, 2009). Incidentally, a similar "communication discrepancy" also occurred in the replacement of Mr. Lewis, Esq., who also had withdrawn (after being on the case for > 7 months) from the subject

Case 2:09-cv-07651-EEF-SS   Document 3   Filed 02/01/10   Page 14 of 16

3

arbitration but, somehow, continued to be "alive" on the subject arbitration panel/roaster, a long time after.

B. **PRE-HEARING (March 23, 2009) RELATED ITEMS:**
Based on the claimant's understanding of FINRA-supplied literature/guidelines on the Pre-hearing procedures, the Panel must make an opening statement to confirm that they all had read/reviewed the case materials, etc.. Frankly, not even a word to that effect was uttered in the pre-hearing. In fact, the night before, I had prepared a very brief summary of the case to present, but there was not a word (from the Panel) that even came close to begin to briefly discus the dispute. The pre-hearing was held just to quickly schedule the hearing date that too was influenced by the respondents' counsel, despite the claimant's request (made twice) for an early arbitration on a serious medical ground (please review the claimant's January 20, 2009, letter to FINRA, which FINRA had confirmed forwarding to all the parties (7 packets), as requested by the claimant. But, unfortunately, FINRA had not done so and no party, including the installed panel, ever received the letter (i.e., the request to expedite the arbitration) until the claimant had to desperately stress its importance in April of 2009. On March 23, 2009 (the pre-hearing date), the claimant's son (whose mother-donated, transplanted-kidney unfortunately had failed to only 16% function, i.e., 84% function lost) also had a pre-scheduled appointment with the regional transplant facility for his registration on the kidney transplant waiting list. Because of the urgent need of an early arbitration, the claimant did not postpone the pre-hearing and instead decided to participate in it and push for an early arbitration. However, the panel simply ignored the 71-year old claimant's request and scheduled the hearing more than a year away from the original claim filing date.

C. **THE (NEW) PANEL HEARING-RELATE ITEMS:**
Frankly, it was abundantly clear that the honorable panel had not properly reviewed and understood the underlying issues of the case. Incidentally, two arbitrators, Public and Industrial, did not even care to take a rather <u>bulky,</u> testimonial folder (given by the Counsel) with them after the first day of hearings; instead they left the two <u>"personal/proprietary"</u> folders right there in the open room. When a female janitor and later a male housekeeper came, I (while still closing my rather big shop of evidentiary materials) had to stop them from taking the folders to a "landfill." The fact that even the Chairman in his opening remarks on the 2nd day said, "We now have read all the case submissions/materials," which says it all. However, even based on the proceedings of the 2nd day, it was abundantly clear to the claimant that the Panel really had not understood the dispute's main underlying issues, namely:

1) **Why TD-Ameritrade, in the first place, had extended a margin loan of ~$250,000 in real time to the claimant for buying stocks and options <u>and actually approved and even allowed the purchase of 20,000 GM shares</u>** (in addition to 50,000 GM shares long in the account), **<u>when it was well known that the already ballooned margin loan of ~$400,000</u>** (*also created, in the first place, **<u>due to TD-A-admitted and well-documented</u>**, lingering problems of their online trading of complex/spread options*), **on an account of only ~ $50,000 liquidation value and, hence, <u>with a dangerously low</u>** (according to TD-A's own standards) liquidation-to-debt ratio of only ~ 12.5% in real time, would (<u>arithmetically, had to</u>) further lower the account's liquidation-to-debt ratio to ~ 8 % at which, TD-A's Risk Department claimed that TD-A had to sellout 40,000 GM shares, **20,000 of which indeed were legitimately purchased just a few minutes ago with TD-Ameritrade's own approval <u>and</u> with the real-time funds (margin loan/debt) made available by TD-A themselves.**

2) Why did TD-Ameritrade denied the claimant's <u>several orders</u> of selling perfectly legitimate COVERED CALLS on his long GM shares that TD-Ameritrade themselves had authorized the purchase <u>with the real-time funds made available to the claimant</u>, especially when TD-A continued to approve the purchase of additional GM shares **EVEN AFTER** TD-A wrongfully and illegally had denied/rejected the claimant's several GM COVERED CALL OPTIONS (WGMAB) and <u>reportedly had taken an "immediate action"</u> (to sellout).

Frankly, the Panel could not even follow <u>the claimant's critical trading Log (Exhibit #2)</u> provided by TD-Ameritrade), which, incidentally, the respondents' Counsel (perhaps intentionally) had not even inserted in their testimonial folder given to the panel. **The incumbent strongly believes that a thorough review and understanding of the log (Claimant's Exhibit #2) and the sequence of the claimant's various orders and trades and TD-A's wrong actions on June 26, 2008, were and still are critical to properly understand TD-A's serious operational problems that, in the first place, originated and created an abnormally huge margin debt by 1) wrongfully extending huge margin dollars, 2) authorizing the claimant to purchase securities with the real-time margin funds made available, and 3) not permitting the claimant to desperately reduce the debt by selling legitimate Covered Calls that do not have margin requirements. These wrong actions taken by TD-A essentially destroyed sustainability of the claimant's long-held, life's savings and investment account due to the forced sellout of 40,000 GM shares** (*20,000 of which, as mentioned above, were legitimately purchased just a few minutes ago with TD-Ameritrade's own approval <u>and</u> with the real-time margin funds made available by TD-A themselves*), **which ultimately <u>totally destroyed</u> the account on October 10, 2008. And despite the claimant's sincere requests (in fact, begging) on both occasions (viz. on June 26 and October 10, 2008) to immediately replenish the disputed trades <u>at the claimant's costs and losses (due to any unfavorable price fluctuations</u>), TD-A (officers/representatives) arrogantly denied by playing delay tactics. All evidences were there and presented in the submitted testimonies, which the panel reportedly had read** (*however, not properly understood*).

3) It was apparent that the Panel, at least the Chairman, <u>who only and mostly spoke anyway</u>, did not realize that the **<u>covered calls</u>** bring in (new) money into the account and, more importantly, do not have or require any additional margin maintenance requirement (MMR), which considerably helps in improving the account's liquidation-to-debt ratio - the critical factor that reportedly led TD-A to sellout 40,000 GM shares and almost destroy the claimant's account and, hence, his life's financial foundation.

4) The panel apparently did not understand that on he day GM went bankrupt, the claimant's eligible 700 WGMAB Calls (after the intended sale of 70,000 GM shares for ~$800,000, as described in the claim summary) would immediately have resulted in a net gain of their total sale proceeds, e.g., ~$300,000 (on June 26, 2009). TD-A illegitimately had denied selling of those Calls several times and thus prevented the claimant to bring in **<u>large amounts</u>** of new (margin-less) money to **reduce the "<u>TD-A-generated</u>" huge margin debt.** Frankly, the Panel could not understand the underlying calculations of these Call options, despite the fact that the claimant even had asked one of the respondents' witnesses to calculate it and he <u>reluctantly</u> did calculate it and came up with a figure of $290,000, based on the price of a WGMAB call/contract on June 26, 2008, as reflected in the Log (Exhibit #2) provided by TD-A. However, the panel still appeared to have taken the calculation lightly and simply ignored to continue its proceeding, either because they really did not understand it or because they really did not want to.

5) Despite displaying a **colored chart** showing the claimant's clear and consistent strategy, over the entire past year, of appropriately and gradually reducing strike price *(from $45 in September '07 to $10 on June 26, '08, <u>which was wrongfully denied by TD-A</u>)* of the GM Leap Options according to the GM's declining stock performance, the panel was unable to understand that the ~ 700 WGMAB GM Calls worth about $300,000 on June 26, 2008 [when <u>swapped</u> the next day to the Strike price of $5 (WGMAA) or even $2.5 (WGMAZ) {*as the claimant consistently and strategically had done (i.e., swapped the Options' strike price, according to performance of the underlying GM stock) hundreds of times during the year of interest alone and, thereby, had more than a million dollars in cash in the account on June 10-12, 2008*} to further reduce the margin debt and/or even generate a credit of several hundred thousand dollars, as described in the case summary] would have brought a net gain of ~$750,000 the day GM declared bankruptcy. On the contrary, the panel seemed to have believed in the totally wrong remarks or comments of the respondents' attorney and his **special (WS) witness**, who told the panel that the claimant had lost his money because GM had gone bankrupt. **It really is sad. The truth or fact is far from**

what they had orchestrated. Had TD-A not rejected the claimant's <u>legitimate sell orders</u> of up to 700 WGMAB for ~ $300,000 (which, as described before, would have been swapped <u>(as it was done numerous times in the same time period)</u> to ~700 WGMAA or even WGMAZ (depending on if any or how much margin debt the claimant really wanted going forward) for much more credit money (up to $700,000) the next day by meeting any margin deficiency/call, via. wire or ACH transfer of funds, <u>which the claimant also had done numerous times</u> during his long and most active trading/business relationship of 10 years with TD-Ameritrade, during which time period TD-A received from the claimant hundreds of thousand dollars <u>in TRANSPARENT COMMISSIONS AND INTEREST CHARGES ALONE!</u>.

D. **RESPONDENTS' COUNSEL-RELATED ITEMS:**
The counsel's Answer, dated January 20, 2008, and Brief, dated October 28, 2009 (*which essentially was in response/answer to the claimant's Brief/Motion/Case Summary, dated October 16, e-mailed to all parties on October 25, 2009*) <u>were full of distortions and false statements</u>. Please, for heaven's sake, spend some time in reviewing the counsel's above documents and the claimant's responses and rebuttals, dated January 23, 2008, January 26, 2008, October 28, 2009, and October 31, 2009, all of which were submitted to the Panel members and the counsel and, as previously documented, were accepted as the claimant's testimonies by the panel and the respondents' counsel during the hearing on November 17, 2009. It is critical to seek justice in this case that has not been properly evaluated by the arbitrators, who, for most part, did not fully review the case and certainly did not posses the required knowledge to fully understand the dispute's main, underlying issues, which were again briefed and submitted to all the parties on the first day of the hearings and, as noted in bold below, the panel and the counsel both had accepted and admitted the submissions as the claimant's testimonies.

**PS: Please, it is critical to note that all of the items under A, B, C and D above were fully described in the claimant's case materials as well as in his "brief submissions" that, <u>BEFORE</u> the Hearings began, were presented simultaneously to the Panel and to the Respondents' Counsel and, <u>DURING</u> the Hearings, were accepted as the claimant's testimonies by both the panel and the respondents' Counsel. Furthermore, on the second day of the hearings, the Panel Chair in his opening remarks acknowledged that the panel members had read/reviewed all of the submissions!**

SINCERELY,
Arthur (A·P·S· SAWHNEY)

Copy to:
1. Ms. Linda D. Feinberg, President of FINRA, New York, NY.
2. Mr. Todd Saltzman, (Ref. # CI 2009-0257) FINRA (One Liberty Plaza, 165 Broadway, 27th Floor. NY, NY 10006-1404)

*PS: Just for your information, I have filed a lawsuit to vacate the Award and seek at least $750,000 from TD-A <u>(the company</u> and not from the two brokers - on whom only the Panel apparently had focussed the proceedings w/o paying any due consideration to the above described, underlying issues of the company's problematic operation and other serious wrongdoings).*